January 28, 1999

NO. 4-98-0374

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

EDWARD T. KANE, ) Appeal from

          Plaintiff-Appellant, ) Circuit Court of

          v. ) Sangamon County

DOCTORS HOSPITAL, ) No. 94L0459

          Defendant-Appellee, )

and ) 

SPRINGFIELD CLINIC, HENRY ROHS, M.D., ) Honorable

and SUNG-HO SONG, M.D., ) Stuart H. Shiffman,

Defendants. ) Judge Presid­ing.

_______________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In April 1996, plaintiff, Edward T. Kane, brought this medical malpractice action against defendants Doctors Hospital (the Hospital) and Dr. Sung-Ho-Song, a radiologist who worked for the Hospital as an independent contractor.  Kane alleged that in February 1992, Dr. Song committed malpractice while acting as the Hospital's apparent agent.  In April 1998, fol­lowing discov­ery, the trial court concluded that Dr. Song was not the Hospi­tal's ap­par­ent agent as a matter of law and entered summary judg­ment for the Hospital.  Kane appeals, arguing that the court erred because genuine issues of material fact exist as to whether Dr. Song was the Hospital's apparent agent.  We reverse and remand.

I. BACKGROUND

The following facts appear from the complaint, deposi­tions, affidavits, and attached documents.  Kane suf­fers from hemo­chro­

ma­to­sis--ex­ces­sive iron in his blood--which can cause damage to vari­ous inter­nal organs.  At the time of the events giving rise to this liti­ga­tion, Kane's condi­tion had not been diag­nosed despite his examination and treatment by nu­mer­ous doc­tors in vari­ous branches of the medi­cal arts.

In 1992, Kane was under the care of several doc­tors who were attempting to diagnose and treat his symptoms.  Dr. Reddy, a psy­

chi­a­trist, sug­gest­ed elec­tro­con­vul­sive shock therapy be­cause some of Kane's symp­toms ap­peared psy­cho­so­matic.  Un­happy with this possi­bility, Kane went to Dr. Juranek, one of his pri­mary care phy­si­cians, and asked him to ap­prove an abdominal com­puter­ized tomography (CT) scan to search for another cause for his con­tinu­

ing ab­dom­i­nal pain.  Dr. Juranek was skep­tical because Kane had previously un­der­gone sev­eral CT scans, which were nor­mal.  Kane persuaded Dr. Juranek to order the pro­cedure by sug­gesting that if this CT scan also came back normal, Kane would un­der­go any treatment Dr. Reddy sug­gested.

Dr. Juranek then scheduled the CT scan at the Hos­pi­tal for the same day.  Dr. Juranek did not discuss with Kane where the CT scan would be performed or why Dr. Juranek chose the Hos­pi­tal.

Kane went to the Hospital's admissions of­fice and signed two consent forms, neither of which indi­cated in any way whether phy­

sicians working at the Hospital were Hospital em­ploy­ees or inde­

pen­dent con­trac­tors.  A Hospital em­ploy­ee then led Kane to the radi­ology de­part­ment, where he signed a third con­sent form.  After Kane changed his clothes, an­other techni­cian escort­ed him to the CT suite, where he un­der­went the ab­domi­nal CT scan.  Dr. Song read the CT scan film and concluded Kane's abdomen was normal.  Dr. Song sent a re­port containing his conclusion to Dr. Juranek on sta­tio­nery bear­ing the Hospi­tal's logo.

Kane stated in his deposition that prior to the CT scan, he did noth­ing to determine whether the radiologist who was going to read his scan film was the Hospital's employee or agent.  He also did not notice any signs in the radiol­ogy de­part­ment dis­closing the radiologists' relationship with the Hos­pi­tal.  Kane had no con­ver­sa­tion with Dr. Song and did not recall ever seeing him.

During his deposition, Kane testified about his general knowledge of business relationships in the medical care industry.  From 1983 to 1990, he worked as a sales representative for Amer­

ican Hospital Supply, which was later absorbed by Baxter Healthline.  In that capacity, Kane spend 95% or more of his time selling supplies to hospitals and surgeons.  The Hospital's at­

torney questioned Kane about the understanding he acquired of surgeons' business relations with hospitals and elicited the following testimony from Kane:

"Q.  [Hospital's attorney:]  All right.  When Baxter was Amer­i­can, for that five per cent of your busi­ness, when you were selling di­rectly to sur­geons, did you have an under­standing at that time that those surgeons were not neces­sarily employees of the hospi­

tal?

A.  Yes.

Q.  In some cases, those surgeons proba­bly had professional corporations set up?

A.  Yes.

Q.  Or were members of a partnership or some other legal entity, correct?

A.  I am not aware of any specifics.  I'm just agreeing with you that it's pos­sible."

However, Kane also testified that he never sold supplies to radi­

ologists, and he stated that he did not know any radiologists socially.

As it turns out, Dr. Song is an employee of Imaging Radiologists, a corporation that had a contractual arrangement with the Hospital to provide 24-hour radiological servic­es.  When questioned about his knowledge of Dr. Song's em­ploy­ment with Imaging Radiologists, Kane gave the following testimony:  

"Q.  Do you know where the office of Imaging Radiologists is located?

A.  No.

Q.  Do you know where the office of Imaging Radiologists, whether Imaging Radiol­ogists has an office within the con­fines of Doctors Hospital?

A.  No, I don't.

Q.  Do you know whether Dr. Song is affiliated in some capacity with Imaging Radiologists?

A.  I believe that he is.

Q.  In what capacity, if you know?

A.  I believe that he's a, that he is an employee of, that he's paid by Imaging Radi­ologists.  That they bill for him."

In April 1998, the trial court entered summary judgment for the Hospital, after determining that, as a matter of law, Dr. Song was not an apparent agent of the Hospital.  This appeal followed.

II. ANALYSIS

Kane argues that the trial court erred by granting summary judgment in the Hospital's favor because genuine issues of material fact exist as to whether Dr. Song was the Hospital's apparent agent.  In response, the Hospital argues that the trial court correctly granted its motion for summary judgment because the record established that (1) Kane knew Dr. Song was not the Hospital's employee; (2) neither the Hospital nor Dr. Song made any representations to Kane that Dr. Song was an agent of the Hospital; (3) Kane did not act reasonably in ascertaining Dr. Song's employment status; and (4) Kane did not rely on any repre­

sentations by the Hospital when he sought radiological treatment. We agree with Kane's argument.

Orders granting summary judgment are subject to 
de
 
novo
 review, and that standard governs our resolution of the present appeal.  
Boub v. Township of Wayne
, 183 Ill. 2d 520, 524, 702 N.E.2d 535, 537 (1998).  The par­ties agree that the out­come of this case is governed by the supreme court's decision in 
Gilbert v. Syca­more Municipal Hospi­tal
, 156 Ill. 2d 511, 622 N.E.2d 788 (1993).  In 
Gilbert
, the supreme court held that a hospital may be vicari­ously liable on an apparent or ostensible principal-

agent rela­tionship between the hospital and physician.  Specifi­

cally, the court held as follows:

"[U]nder the doctrine of apparent authority, a hospital can be held vicariously liable for the negligent acts of a physician provid­ing care at the hospital, regardless of whether the physician is an independent con­tractor, unless the patient knows, or should have known, that the physician is an indepen­dent contractor."  
Gilbert
, 156 Ill. 2d at 524, 622 N.E.2d at 795.

The 
Gilbert
 court then reviewed the elements of a cause of action based upon apparent agency in a hospital setting, as follows:

"'For a hospital to be liable under the doc­trine of apparent authority, a plaintiff must show that:  (1) the hospital, or its agent, acted in a manner that would lead a reason­able person to conclude that the in­

dividual who was alleged to be negligent was an em­

ployee or agent of the hospital; (2) where the acts of the agent create the ap­pearance of authority, the plain­tiff must also prove that the hospital had knowledge of and ac­quiesced in them; and (3) the plain­

tiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordi­nary care and prudence.'  
Pamperin [v. Trinity Memorial Hospital
], 144 Wis. 2d [188,] 207-08, 423 N.W.2d [848,] 855-56 [(1988)]."  
Gilbert
, 156 Ill. 2d at 525, 622 N.E.2d at 795.

The supreme court also observed that all of the following are questions of fact:  whether (1) an agent is au­tho­rized to act; (2) a plaintiff has no­tice of a lack of an agent's authori­ty; or (3) a plaintiff is put on notice by circum­stances.  
Gil­bert
, 156 Ill. 2d at 524, 622 N.E.2d at 795.

Discussing the type of proof suf­ficient to prove the elements of a cause of action based upon apparent agency in a hospital setting, the court stat­ed the fol­low­ing:

"The element of 'holding out' on the part of the hospital does not require an express representation by the hospi­tal that the person alleged to be negligent is an employee.  Rather, the element is satisfied if the hospital holds itself out as a provid­er of emergency room care without in­forming the patient that the care is provided by indepen­dent contractors.  [Citation.]  

The element of justifiable reliance on the part of the plaintiff is satisfied if the plaintiff relies upon the hospital to provide complete emergency room care, rather than upon a specific physician.  The 
Pamperin
 court explained:

'We agree with these decisions that the critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospi­tal merely as a place for his or her personal physician to provide medical care.  Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seek­ing care from the hospital itself.  An in­dividual who seeks care from a hospital itself, as opposed to care from his or her personal physician, ac­cepts care from the hospital in reliance upon the fact that com­

plete emergency room care--from blood testing to radiological read­ings to the endless medical support services--will be provided by the hospital through its staff.'  [Cit­

ation.]"  
Gilbert
, 156 Ill. 2d at 525-26, 622 N.E.2d at 796.

In sum, the supreme court in 
Gilbert
 concluded as fol­lows:

"We stress that liability attaches to the hospital only where the treating physi­cian is the apparent or ostensible agent of the hospital.  If a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable."  
Gilbert
, 156 Ill. 2d at 522, 622 N.E.2d at 794.  

A. Kane's Knowledge of Dr. Song's Status

The Hospital first claims that Kane's deposition tes­ti­mo­ny and his employment as a sales representative to hospi­tals and physi­cians demonstrate that he knew Dr. Song was an indepen­dent con­trac­tor.  We disagree.  

Kane's deposition testimo­ny is, at best, am­bigu­ous.  He acknowledged that he was aware Dr. Song was an employee of Imag­

ing Radiologists.  However, the Hospital never asked Kane when he became aware of that fact.  That he possessed this infor­ma­tion at the time of his deposition--which occurred several years after his CT scan at the Hospital--is un­remarkable and says noth­ing about wheth­er he knew that Dr. Song was an employee of Imag­ing Radiologists when he un­der­went the CT scan.  Like­wise, the fact that Kane was billed for the radio­logi­cal ser­vic­es by Imag­ing Radiologists 
after
 he underwent the CT scan does not dem­on­strate the ex­tent of his knowl­edge at the time the ser­vices were ren­

dered.  More­over, in his com­plaint, Kane stated that (1) he as­sumed the radiolo­gist who would per­form and read his CT scan was part of the Hos­pital's staff; and (2) he did not know wheth­er Dr. Song was the Hospital's employee or an in­dependent con­trac­tor.  Fi­nally, Kane testi­fied that he made no in­quiry prior to the treat­ment regarding Dr. Song's status.  Thus, a genuine issue of mate­rial fact exists as to wheth­er Kane was aware that Dr. Song was an inde­pen­dent contrac­tor at the time Kane un­der­went the CT scan.

Kane's additional testimony that he was aware phy­si­cians were not necessarily employees of hospi­tals says noth­ing about the actual state of his knowledge regarding Dr. Song's business relationship with the Hospital, espe­cially in view of the fact Kane never sold medi­cal sup­plies to radiolo­gists.  While a ques­

tion may exist as to whether Kane should have known that Dr. Song in particular or radi­olo­gists in general work as inde­pen­dent con­

trac­tors, this is a ques­tion of fact for a jury to deter­mine.

B. The Hospital's Representations to Kane

The Hospital next contends that no evidence shows that ei­

ther it or Dr. Song affirmatively represented to Kane that Dr. Song was the Hospital's agent or employee.  Under 
Gil­bert
, howev­

er, the element of "holding out" on the part of the hospi­tal "does not require an express representa­tion by the hos­pital that the person alleged to be negligent is an em­ployee."  
Gilbert
, 156 Ill. 2d at 525, 622 N.E.2d at 796.  Rath­er, this element is sat­

is­fied if the hospital holds itself out as a "pro­vider of *** care without informing the patient that the care is provided by in­dependent contractors."  
Gilbert
, 156 Ill. 2d at 525, 622 N.E.2d at 796.  The evidence in this case shows the Hospital did not advise Kane one way or another as to Dr. Song's sta­tus.  Under 
Gilbert
, silence is suf­ficient for liability to at­tach.  

C. Kane's Failure To Ascertain Dr. Song's 

Relationship with the Hospital

The Hospital's next contention, that Kane did not take any action that would lead a reason­able person to be­lieve that Dr. Song was affiliated with the Hospital, is also misplaced.  Under 
Gilbert
, no requirement exists that a plain­tiff must make a di­

rect inquiry into the status of physi­cians working in a hos­pi­tal.  Instead, the burden is on hospitals to put their patients on no­

tice of the independent status of the pro­fessionals with whom the patients might be expected to come in contact.  
Gilbert
, 156 Ill. 2d at 521, 622 N.E.2d at 794.

D. Kane's Lack of Reliance on His Belief that 

Dr. Song Was the Hospital's Employee

Last, the Hospital contends that be­cause Dr. Juranek scheduled the CT scan and picked the Hospi­tal without Kane's input, Kane did not choose the Hospital; therefore, he could not have relied on any rep­re­sen­ta­tions from the Hos­pital or Dr. Song be­cause the deci­sion to choose the Hospital was taken out of Kane's hands.  Noth­ing in 
Gil­bert
, howev­er, sug­gests a plain­tiff must make an indepen­dent deter­mina­tion of whether to rely on a partic­ular hospital for treat­ment.  As the court held in 
Monti v. Sil­ver Cross Hospi­tal
, 262 Ill. App. 3d 503, 507-08, 637 N.E.2d 427, 430 (1994), a pa­tient may rely on others to choose a par­

ticu­lar medi­cal fa­cili­ty for treatment.  In this case, Kane re­

lied on Dr. Juranek to set up treat­ment he des­per­ately wanted.  That is sufficient.

On the re­cord be­fore us, we con­clude that genu­ine is­sues of mate­rial fact exist as to wheth­er Kane knew or should have known Dr. Song was an in­depen­dent con­tractor at the time the medical ser­vices were ren­dered.  For this reason, we conclude that the trial court erred by grant­ing summary judg­ment in the Hospital's favor.

III. CONCLUSION

For the reasons stated, we reverse the trial court's judg­

ment and remand for fur­ther pro­ceed­ings.  

Reversed and remanded.

KNECHT, P.J., and GARMAN, J., concur.